**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHEMONT INTERNATIONAL SA, | ) | |
| CARTIER INTERNATIONAL A.G., | ) | |
| MONTBLANC-SIMPLO GMBH, CHLOE | ) | Case No. 15-cv-5991 |
| S.A.S., VAN CLEEF & ARPELS SA, | ) | |
| OFFICINE PANERAI A.G., and LANCEL | ) | |
| INTERNATIONAL SA, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE PARTNERSHIPS and | ) | |
| UNINCORPORATED ASSOCIATIONS | ) | |
| IDENTIFIED ON SCHEDULE "A," | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT**

Plaintiffs RICHEMONT INTERNATIONAL SA, CARTIER INTERNATIONAL A.G.,

MONTBLANC-SIMPLO GMBH, CHLOE S.A.S., VAN CLEEF & ARPELS SA, OFFICINE

PANERAI A.G., and LANCEL INTERNATIONAL SA (collectively, "Plaintiffs") hereby bring

the present action against the Partnerships and Unincorporated Associations identified on

Schedule A attached hereto (collectively, "Defendants") and allege as follows:

**I. JURISDICTION AND VENUE**

1.      This Court has original subject matter jurisdiction over the claims in this action

pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051 et seq., 28 U.S.C. § 1338(a)-(b)

and 28 U.S.C. § 1331.  This Court has jurisdiction over the claims in this action that arise under

the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a), because the state law claims are

so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, including Illinois, through at least the fully interactive, commercial Internet stores operating under the Defendant Domain Names and/or the Online Marketplace Accounts identified in Schedule A attached hereto (collectively, the "Defendant Internet Stores").  Specifically, Defendants are reaching out to do business with Illinois residents by operating one or more commercial, interactive Internet Stores through which Illinois residents can purchase products bearing counterfeit versions of Plaintiffs' respective trademarks.  Each of the Defendants has targeted sales from Illinois residents by operating online stores that offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, has sold counterfeit products bearing counterfeit versions of Plaintiffs' respective trademarks to residents of Illinois.  Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiffs substantial injury in the State of Illinois.

## II. INTRODUCTION

3.     Plaintiffs are all subsidiaries of Compagnie Financière Richemont SA ("Richemont"), which owns several of the world's leading companies in the field of luxury goods, with particular strengths in jewelry, luxury watches and writing instruments.  This action has been filed by Plaintiffs to combat online counterfeiters who trade upon Plaintiffs' respective reputations and goodwill by selling and/or offering for sale unauthorized and unlicensed knockoff products featuring counterfeits of Plaintiffs' trademarks (the "Counterfeit Products").

The Defendants create the Defendant Internet Stores by the hundreds or even thousands and design them to appear to be selling Plaintiffs' genuine products, while actually selling Counterfeit Products to unknowing consumers. The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the Counterfeit Products offered for sale, establishing a logical relationship between them and suggesting that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by going to great lengths to conceal both their identities and the full scope and interworking of their massive counterfeiting operation. Plaintiffs are forced to file this action to combat Defendants' counterfeiting of their respective registered trademarks, as well as to protect unknowing consumers from purchasing Counterfeit Products over the Internet. Plaintiffs have been and continue to be irreparably damaged through consumer confusion, dilution, and tarnishment of their valuable trademarks as a result of Defendants' actions and seek injunctive and monetary relief.

## III. THE PARTIES

**Plaintiffs**

**Plaintiff Cartier**

4. Plaintiff CARTIER INTERNATIONAL A.G. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, 6312 Steinhausen, Switzerland ("Cartier"). Cartier is a subsidiary of Richemont.

5. Cartier is one of the preeminent symbols of luxury in the world. Since at least as early as 1847, Cartier and its predecessors-in-interest and associated companies have been using the CARTIER trademark on and in connection with the advertising and sale of luxury products,

including, *inter alia*, watches, watch buckles, clocks, jewelry, scarves, handbags, eyewear, pens, letter openers, perfumes, and cigarette lighters (collectively, the "CARTIER Products").

6.     CARTIER Products are distributed and sold to consumers through over 300 Cartier boutiques, including one located at 630 N. Michigan Avenue in Chicago, Illinois, as well as through thousands of authorized retailers worldwide.  Cartier has for some time operated a website where it promotes genuine CARTIER Products at cartier.us and cartier.com.  More recently, these websites have offered e-commerce of CARTIER Products via the cartier.us and cartier.com websites.  The cartier.us and cartier.com websites feature proprietary content, images and designs exclusive to Cartier.

7.     Cartier incorporates a variety of distinctive marks in the design of its various CARTIER Products.  As a result of its long-standing use, Cartier owns common law trademark rights in its CARTIER trademarks.  Cartier has also registered its trademarks with the United States Patent and Trademark Office.  CARTIER Products typically include the CARTIER registered trademark.  Cartier uses its trademarks in connection with the marketing of its CARTIER Products, including the following marks which are collectively referred to as the "CARTIER Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 411,975 | *Cartier* | February 13, 1945 | For:  Watches and clocks and wrist watches with wrist straps and bracelets attached for securing the same on the wrist of the wearer, and traveling clocks and watches with covers of leather, fabric and the like for protecting them while traveling in Class 014. |

| 415,184 | *Cartier* | July 31, 1945 | For: Magnifying glasses, thermometers, reading glasses, graduated rulers, and tape measures in Classes 001, 009 and 010. |
|---|---|---|---|
| 759,201 | CARTIER | October 29, 1963 | For: Watches and clocks in Class 014. |
| 759,202 | CARTIER | October 29, 1963 | For: Articles of jewelry for personal wear, not including watches; and the following goods of solid or plated silverware- namely, hollow-ware, jewelry cases, and buckles in Classes 008 and 014. |
| 1,005,286 | LOVE BRACELET | February 25, 1975 | For: Jewelry, namely, bracelets in Class 014. |
| 1,114,482 |  | March 6, 1979 | For: Articles of jewelry, watches and clocks in Class 014. |
| 1,344,284 | SANTOS | June 25, 1985 | For: Watches in Class 014. |
| 1,353,952 | PANTHERE | August 13, 1985 | For: Watches in Class 014. |
| 1,365,478 | PANTHERE DE CARTIER | October 15, 1985 | For: Watches in Class 014. |
| 1,372,423 |  | November 26, 1985 | For: Bracelets in Class 14. |
| 1,391,539 | SANTOS DE CARTIER | April 29, 1986 | For: Watches in Class 014. |
| 1,483,326 | PASHA | April 5, 1988 | For: Watches in Class 014. |

| 1,535,215 |  | April 18, 1989 | For:  Bracelets, rings, earrings in Class 014. |
|---|---|---|---|
| 1,948,372 | TORTUE | Jan. 16, 1996 | For:  Watches in Class 014. |
| 2,092,409 | BAIGNOIRE | September 2, 1997 | For:  Watches and clocks in Class 014. |
| 2,322,769 |  | February 29, 2000 | For:  Watches in Class 014. |
| 2,436,100 |  | March 20, 2001 | For:  Watches in Class 014. |
| 3,006,779 | TANK | October 18, 2005 | For:  Jewellery, such as earrings, rings in Class 014. |
| 3,059,210 | BALLERINE | February 14, 2006 | For:  Rings in Class 014. |
| 3,162,410 |  | October 24, 2006 | For: Jewelry, namely, bracelets, watches, rings, charms, earrings, dog tag type pendants; cuff links; belt buckles made of precious metal in Class 014. |

| 3,211,038 |  | February 20, 2007 | For: Horologic and chronometric instruments, namely, watches in Class 014. |
| 3,282,739 |  | August 21, 2007 | For: Horologic and chronometric instruments, namely, watches in Class 014. |
| 3,282,847 |  | August 21, 2007 | For: Horologic and chronometric instruments, namely, watches in Class 014. |
| 3,476,888 | BALLON BLEU | July 29, 2008 | For: Watches, chronometers, clocks in Class 014. |
| 3,557,455 | Pasha de Cartier | January 6, 2009 | For: Horological instruments in Class 014. |
| 3,637,776 | Love | June 16, 2009 | For: Goods in precious metals and coated therewith, namely, cuff-links, rings, bracelets, earrings, necklaces in Class 014. |

| 3,776,794 |  | April 20, 2010 | For: Jewelry, namely, rings, bracelets, charms, earrings, made of precious metals in Class 014. |
| 3,898,366 |  | January 4, 2011 | For: Horologic and chronometric instruments, namely, watches in Class 014. |
| 4,178,047 | *Cartier* | July 24, 2012 | For: Jewelry and watches in Class 014. |
| 4,483,522 |  | February 18, 2014 | For: Watches in Class 014. |
| 4,487,142 |  | February 25, 2014 | For: Watches in Class 014. |
| 4,603,805 | BALLON DE CARTIER | September 16, 2014 | For: Jewelry and watches in Class 014. |
| 4,705,798 | **PANTHERE** | March 24, 2015 | For: Handbags, purses, wallets, and credit card holders, all of the aforesaid goods made from leather; handbags, purses, wallets, and credit card holders, all of the aforesaid goods made from imitations of leather; leather and imitation leather bags in Class 018. |

8.     The CARTIER Trademarks have been used exclusively and continuously by Cartier and its predecessors-in-interest and associated companies in the U.S., some since at least as early as 1859, and have never been abandoned.  The above registrations for the CARTIER Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.   Attached hereto as **Exhibit 1** are true and correct copies of the U.S. Registration Certificates for the CARTIER Trademarks included in the above table.   The registrations for the CARTIER Trademarks constitute *prima facie* evidence of their validity and of Cartier's exclusive right to use the CARTIER Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Montblanc**

9.     Plaintiff MONTBLANC-SIMPLO GMBH is a corporation organized and existing under the laws of Germany, having its principal place of business at Hellgrundweg 100 22525 Hamburg, Germany ("Montblanc").  Montblanc is a subsidiary of Richemont.

10.     Montblanc is an internationally recognized manufacturer, distributor and retailer of high quality writing instruments, watches and other goods, all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including MONTBLANC (collectively, the "MONTBLANC Products").

11.     MONTBLANC Products are distributed and sold to consumers through a worldwide network of Montblanc boutiques and other tightly-controlled distribution partnerships.   In 2011, Montblanc established an e-commerce site in the United States at montblanc.com.  Montblanc also launched an e-commerce platform in Europe, covering France, The United Kingdom, and Germany.  Sales of MONTBLANC Products via the montblanc.com website represent a significant portion of Montblanc's business.  The montblanc.com website features proprietary content, images and designs exclusive to Montblanc.

12.     Montblanc incorporates a variety of distinctive marks in the design of its various MONTBLANC Products.  As a result of its long-standing use, Montblanc owns common law trademark rights in its MONTBLANC trademarks.  Montblanc has also registered its trademarks with the United States Patent and Trademark Office.  MONTBLANC Products typically include at least one of Montblanc's registered trademarks.  Montblanc uses its trademarks in connection with the marketing of its MONTBLANC Products, including the following marks which are collectively referred to as the "MONTBLANC Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 776,208 | MONTBLANC | September 1, 1964 | For:  Fountain pens, cases for fountain pens, ball point pens, ball point cartridges, ball point paste, mechanical pencils, lead for mechanical pencils in class 016. |
| 839,016 |  | November 21, 1967 | For:  Fountain pen ink in class 002.<br><br>For:  Fountain pens, cases for fountain pens, ball point pens, ball point cartridges, mechanical pencils, lead for mechanical pencils, desk stands for pens in class 016. |
| 1,324,392 | MEISTERSTUCK | March 12, 1985 | For:  Fountain pens, ballpoint pens and mechanical pencils including sets thereof, all made partially with precious metals and sold in specialty stores in class 016. |
| 1,825,001 | MONTBLANC | March 8, 1994 | For: Spectacles and sunglasses in class 009. |

| | | | |
|---|---|---|---|
| 1,878,584 |  | February 14, 1995 | For: Jewelry, watches and timepieces in class 018.<br><br>For: Purses, handbags, small leather articles and accessories, namely wallets and billfolds, and luggage in class 018. |
| 1,884,842 | MONTBLANC | March 21, 1995 | For: Jewelry, watches and timepieces in class 014.<br><br>For: Purses, handbags, small leather articles and accessories, namely wallets and billfolds, and luggage in class 018. |
| 2,202,465 | MONTBLANC | November 10, 1998 | For: toilet soaps, perfume, cologne, eau de toilette, perfumed body cream, hair and body shampoo, deodorant, and after shave lotion in class 003. |
| 2,415,189 | MONTBLANC | December 26, 2000 | For: clothing accessories, namely, dress belts made of leather with belt buckles of precious and semi-precious metals distributed in channels of commerce where luxury articles are sold and promoted in class 025. |
| 2,515,092 |  | December 4, 2001 | For: stationery, namely, writing paper, writing cards in class 016. |
| 2,747,460 | MEISTERSTÜCK | August 05, 2003 | For: Jewelry, cuff-links, and tie bars in class 014. |
| 3,021,081 |  | November 29, 2005 | For: education and training services, namely, arranging and conducting conferences, award programs, seminars, colloquiums, exhibitions and lectures in the field of arts education, literacy, musicianships, charitable activities, artisanship, arranging |

| | | | |
|---|---|---|---|
| | | | and conducting programs and exhibitions for educational and entertainment purposes featuring artists and their works; providing recognition and incentives by the way of awards to demonstrate excellence in the fields of literacy arts education and artistic accomplishments; arranging and conducting competitive sporting and cultural events in class 042. |
| 3,021,088 | 4810 | November 29, 2005 | For: Watches, wristwatches, chronometers, jewelry articles, namely, earrings, rings, necklaces in class 014.<br><br>For: Writing instruments, in particular, fountain pens, in class 016. |
| 3,059,776 | MONT BLANC | February 21, 2006 | For: Money clips, key rings in class 006.<br><br>For: Pocket-knives, razors in class 008.<br><br>For: Graduated rulers in class 009.<br><br>For: Drinking flasks not of precious metal; serving trays, butlers trays, all being not of precious metal; shaving brushes, shaving brush stands in class 021.<br><br>For: Ashtrays not of precious metal, tobacco pouches, cigar cutters, cigar and cigarette cases not of precious metal, cigarette and cigar lighters for smokers not of precious metal in class 034. |
| 3,659,753 | | July 28, 2009 | For: Writing instruments, namely, pens in class 016. |

| | | | |
|---|---|---|---|
| 3,894,136 |  | December 21, 2010 | For:  Jewelry; cuff links in class 014. |
| 4,295,116 | MONT BLANC | February 26, 2013 | For:  Retail store services featuring watches, writing instruments and parts and fittings therefor, writing inks and refills for writing instruments, leather goods, belts, jewelry, eyewear, fragrances, stationery, stationery refills, desk sets, personal care products; online retail store services featuring watches, writing instruments, writing inks and refills for writing instruments, leather goods, belts, jewelry, eyewear, fragrances, stationery, stationery refills in class 035. |
| 4,359,666 | 4810 | July 2, 2013 | For:  Eyeglasses, sunglasses, eyeglass frames and cases; graduated rulers in class 009.<br><br>For:  Jewellery articles, namely, bracelets, cufflinks in class 014.<br><br>For:  Document markers; pouches for writing instruments; inks and ink refills for writing instruments; diaries; personal organizers; paperweights; pen and pencil holders in class 016.<br><br>For:  Belts in class 025. |
| 4,582,264 | MONTBLANC | August 12, 2014 | For: Retail store services in the field of luxury goods in the nature of watches, chronometers, luxury writing instruments and parts and fittings therefor, leather goods, belts, jewelry, eyewear, fragrances, stationery, stationery |

|  |  |  | refills, desk sets, personal care products provided via the Internet and other computer and electronic communication networks in class 035.

For: Telecommunication services, namely, routing of Internet queries from end users to website hosting providers; providing access to an online computer database in the field of domain name registration information; connection of Internet domains and e-mail-addresses in computer networks, namely, data communication by electronic mail in class 038.

For: Technical IT project management services for managing and tracking computer network domain names in connection with the registration of domain names for identification of users and Internet protocol addresses on the Internet; verification of identities for the purpose of permitting or denying access to information and services in the nature of computer security services, namely, enabling or restricting access to computer networks to authorized users by means of a website featuring technology that verifies user identities; Internet Protocol (IP) address verification in class 042.

For: Legal services, namely, registration of domain names for identification of users on a global computer network; registration services enabling entities to manage information related to |

| | | | |
|---|---|---|---|
| | | | domain names and e-mail addresses for use on a global computer network, namely, issuing and registration of domain names and e-mail addresses; licensing of domain names; legal services, namely, administration of domain names and e-mail addresses in class 045. |
| 4,669,133 | **MONT BLANC** | January 13, 2015 | For: Soaps; perfumery; essential oils; cosmetic preparations for body and beauty care in class 003.<br><br>For: Eyeglasses, sunglasses; eyeglass frames and cases; magnifying glasses; computer and tablets carrying cases and bags; holders and cases for telephones, portable telephones and smartphones; accessories for portable telephones, smartphones and tablets, namely, cases, bags; data recording and storage media device and instruments, namely, blank USB flash drive; graduated rulers in class 009.<br><br>For: Jewelry; precious stones; precious metals and their alloys; cufflinks; tie clips; rings; bracelets; earrings; necklaces; brooches; key rings of precious metal; jewelry cases; boxes of precious metals; horological and chronometric instruments; watches; chronometers; clocks; small clocks; watch cases; watch bands; watch bracelets; key rings, trinkets, or fobs of precious metal in class 014.<br><br>For: Stationery; articles of paper or cardboard, namely, boxes, bags, envelopes and pouches for |

| | | | |
|---|---|---|---|
| | | | packaging; wrapping paper; writing instruments; pouches for writing instruments; cases for writing instruments; inks and ink refills for writing instruments; desk sets; writing books; calendars, note books, card and document files, announcement cards; writing paper, envelopes, index cards; business cards; writing pads; writing instrument holders; paperweights; diaries, cover for diaries, replacement papers for diaries; inkwells; check book holders, passport holders; document holders and cases; photo albums; bookends; money clips; writing cases for writing instruments in class 016.<br><br>For: Handbags, travelling bags, rucksacks, garment bags for travel, traveling sets comprised of luggage, suitcases, bags for sports, wheeled bags, wallets, purses, name cards cases, briefcases, attaché cases, key cases of leather or imitation leather; travelling trunks; unfitted vanity cases; evening purses; leather straps; boxes of leather or leather board, trunks and suitcases; credit card holder in class 018. |
| 4,686,500 |  | February 17, 2015 | For: Soaps, perfumery, essential oils, cosmetic preparations for body and beauty care in class 003.<br><br>For: Eyeglasses, sunglasses; eyeglass frames and cases; magnifying glasses; computer and tablet computer carrying cases and bags; holders and cases for telephones, portable telephones and smartphones; accessories for |

|  |  |  | portable telephones, smartphones and tablet computers, namely, earphones and headphones; graduated rulers in class 009.<br><br>For:  Jewelry; cuff links; tie clips; rings, bracelets, earrings, necklaces, brooches; key rings of precious metal; watches, chronometers, clocks, watch movements, watch straps, watch bracelets, boxes of precious metal for watches and jewelry in class 014.<br><br>For: Paper, cardboard; paper boxes; cardboard boxes; printed matter, namely, calendars, paper cards; stationery; articles of paper or cardboard, namely, boxes, bags, envelopes and pouches for packaging; wrapping paper; writing instruments; replacement parts for writing instruments, namely, nibs, caps, and clips; pouches for writing instruments; cases for writing instruments; inks and ink refills for writing instruments; blank writing books; calendars, note books; writing paper, envelopes; business cards; paperweights; diaries, covers for diaries, replacement papers for diaries; inkwells; checkbook holders, passport holders; document holders; document portfolios; photo albums; bookends; money clips; letter trays, writing instrument holders, writing paper pad refills; desk sets, desk stands for writing instruments and office implements in the nature of office stationery, pen and pencil holders in class 016. |
|--|--|--|--|

| | | | For: Leather and imitation leather, leather and imitation leather goods, namely, handbags, travelling bags, bags for sports, wheeled bags, wallets, purses, credit card holders, briefcases, attaché-cases, key cases, trays made of leather in the nature of leather grooming organizers for travel, travelling trunks, unfitted vanity cases, handbags, boxes of leather or leather board, trunks and suitcases, and bags for packaging in class 18. |
|---|---|---|---|

13.     The MONTBLANC Trademarks have been used exclusively and continuously by Montblanc in the U.S., some since at least as early as 1913, and have never been abandoned. The above registrations for the MONTBLANC Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 2** are true and correct copies of the U.S. Registration Certificates for the MONTBLANC Trademarks included in the above table.  The registrations for the MONTBLANC Trademarks constitute *prima facie* evidence of their validity and of Montblanc's exclusive right to use the MONTBLANC Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Chloe**

14.     Plaintiff CHLOE S.A.S. is a corporation organized and existing under the laws of France, having its principal place of business at 5-7 Av. Percier 75008 Paris, France ("Chloe"). Chloe is a subsidiary of Richemont.

15.     Chloe is an internationally recognized manufacturer, distributor and retailer of high-quality fashion apparel, jewelry, handbags, and other accessories and related goods, all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including CHLOE (collectively, the "CHLOE Products").  CHLOE Products have

become enormously popular and even iconic, driven by Chloe's arduous quality standards and innovative design. Among the purchasing public, genuine CHLOE Products are instantly recognizable as such. In the United States and around the world, the Chloe brand has come to symbolize high quality, and CHLOE Products are among the most recognizable luxury products in the world.

16. CHLOE Products are distributed and sold to consumers through a worldwide network of select authorized Chloe online retailers, dealers, boutiques, and at finer department stores such as Bergdorf Goodman, Bloomingdale's, Nordstrom, Barneys New York, and Saks Fifth Avenue. Chloe also promotes the CHLOE Products online at chloe.com. The chloe.com website features proprietary content, images and designs exclusive to Chloe.

17. Chloe incorporates a variety of distinctive marks in the design of its various CHLOE Products. As a result of its long-standing use, Chloe owns common law trademark rights in its CHLOE trademarks. Chloe has also registered its trademarks with the United States Patent and Trademark Office. CHLOE Products typically include at least one of Chloe's registered trademarks. Chloe uses its trademarks in connection with the marketing of its CHLOE Products, including the following marks which are collectively referred to as the "CHLOE Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 950,843 | Chloé | January 16, 1973 | For: Ladies' articles of clothing for outerwear-namely, frocks, dresses, coats, costumes, suits, skirts, blouses, vests and pant-suits, vests, and ladies' shoes in classes 010, 025, 026. |
| 1,103,275 | Chloé | October 3, 1978 | For: Body lotions and body cleansing gels in class 003. |

| 1,491,810 | CHLOE | June 14, 1988 | For: Perfume toilet water, cologne, body lotion, body cream, personal deodorant, and beauty or bath soap in class 003.<br><br>For: Handbags, and purses in class 018.<br><br>For: Bathrobes, bathing suits, coats, dresses, hats, jackets, shirts, blouses, trousers, skirts, scarves, and shoes in class 025. |
| --- | --- | --- | --- |
| 1,925,176 | CHLOE | October 10, 1995 | For: Sunglasses, cases and containers for such sunglasses in class 009. |
| 2,641,982 | SEE BY CHLOE | October 29, 2002 | For: Travelling bags, holdalls, tote bags, handbags, credit card case, purses, wallets, key cases, coin purses, parts and fittings for all the aforesaid goods in class 018.<br><br>For: Clothing, namely, trousers, skirts, suits, dresses, jackets, blousons, shirts, coats, cardigans, sweaters, blouses, shorts, t-shirts, and pullovers in class 025. |
| 2,745,487 | CHLOE | April 5, 2003 | For: Jewelry in class 014. |
| 3,198,388 | CHLOE | January 16, 2007 | For: Optical apparatus and instruments, namely, spectacles, sunglasses, eyeglasses, eye shades, and frames, earpieces, lenses, cords, chains, cases and containers therefore in class 009. |
| 3,921,204 | LOVE, Chloé | February 15, 2011 | For: Perfumery, perfumes, cosmetic preparations for skin, body creams, body lotions, and personal deodorants in class 003. |
| 4,348,622 | SeeBy Chloé | June 11, 2013 | For: Perfumery, perfumes, toilet water, eau-de-Cologne, scented water for perfume, shower and bath |

| | | | gels, bubble bath, toilet soaps, Personal deodorants, cosmetics in the nature of face, body and hand creams, milks, lotions, gels and powders, beauty masks, liquid creams for the body, essential oils, oils for perfumes and scents for body care, make-up preparations, lipsticks, foundations, pencils for the eyes, eyebrow and lips, eye shadows, mascara, eyeliners, nail varnish, shampoos, hair conditioners, hair styling and hair care preparations, and make-up removing preparations in class 003. |
|---|---|---|---|

18. The CHLOE Trademarks have been used exclusively and continuously by Chloe in the U.S., some since at least as early as 1973, and have never been abandoned. The above registrations for the CHLOE Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 3** are true and correct copies of the U.S. Registration Certificates for the CHLOE Trademarks included in the above table. The registrations for the CHLOE Trademarks constitute *prima facie* evidence of their validity and of Chloe's exclusive right to use the CHLOE Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Van Cleef & Arpels**

19. Plaintiff Van Cleef & Arpels, S.A. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at 8 Route des Biches, 1752 Villars-sur-Glane, Switzerland ("Van Cleef & Arpels"). Van Cleef & Arpels is a subsidiary of Richemont.

20. Established in France in 1906, Van Cleef & Arpels and its predecessors-in-interest and associated companies have been doing business under the VAN CLEEF &

ARPELS name and mark for more than 100 years.  Since its inception, Van Cleef & Arpels has been known for its innovative, highly artistic and high-quality luxury jewelry and timepieces (the "VAN CLEEF & ARPELS Products").

21.     The VAN CLEEF & ARPELS Products are sold through more than 100 Van Cleef & Arpels points of sale, including one located at 933 North Michigan Avenue in Chicago, Illinois, and through a network of authorized retailers worldwide.  VAN CLEEF & ARPELS Products are also promoted and sold online at vancleefarpels.com. The vancleefarpels.com website features proprietary content, images and designs exclusive to Van Cleef & Arpels.

22.     Van Cleef & Arpels incorporates a variety of distinctive marks in the design of its various VAN CLEEF & ARPELS Products.  VAN CLEEF & ARPELS Products typically include at least one of the Van Cleef & Arpels registered trademarks.  Van Cleef & Arpels uses its trademarks in connection with the marketing of its VAN CLEEF & ARPELS Products, including the following marks which are collectively referred to as the "VAN CLEEF & ARPELS Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,415,794 | Van Cleef & Arpels | Nov. 04, 1986 | For: Jewelry and watches in class 014. |
| 1,584,572 | VCA | Feb. 27, 1990 | For: Jewelry in class 014. |
| 1,602,394 | Van Cleef & Arpels | Jun. 19, 1990 | For: Scarves in class 025. |
| 1,603,678 | Van Cleef & Arpels | June 26, 1990 | For: Leather Note Pad Holders in class 016. |

| 2,692,672 |  | Mar. 04, 2003 | For: Jewelry; watches; in class 014. |
|---|---|---|---|
| 2,751,878 | ALHAMBRA | Aug. 19, 2003 | For: Precious metal and their alloys and products made therewith not included in in other classes, namely, jewelry, horological and chronometric instruments, namely watches and watch bracelets and necklaces, jewelry chains of precious metal, earrings, jewelry rings, pendants, ankle bracelets and necklaces, jewelry chains of precious metal, earrings, jewelry chains of precious metal, earrings, jewelry rings, pendants, ankle bracelets, cuff links, studs made of precious metal, in class 014. |
| 2,936,247 | VAN CLEEF & ARPELS | Mar. 29, 2005 | For: Items made of precious metal, namely, rings, bracelets, earrings, necklaces, pendants, charms, brooches, clips, hairclips, jewelry boxes, jewelry cases, watch bracelets and buckles; jewelry, watches and clocks in class 014. |
| 3,318,861 | POETICAL COMPLICATION | Oct. 23, 2007 | For: Watches in class 014. |
| 3,450,603 | SWEET ALHAMBRA | Jun. 17, 2008 | For: Jewelry in class 014. |
| 3,489,019 | ALHAMBRA | Aug. 19, 2008 | For: jewelry; clock and watch making, namely, watches, watch bracelets, clocks, horological and |

| | | | |
|---|---|---|---|
| | | | chronometric instruments in class 014. |
| 3,588,364 |  | Mar. 10, 2009 | For: jeans for women, trousers for women in class 025. |
| 3,852,100 | DOMINO | Sep. 28, 2010 | For: Watches in class 014. |
| 3,964,525 | UNE JOURNEE A PARIS | May 24, 2011 | For: Precious metals and their alloys; jewelry; precious stones; horological and chronometric instruments in class 014. |
| 4,037,174 |  | Oct. 11, 2011 | For: Jewelry in class 014. |
| 4,065,318 | POETRY OF TIME | Dec. 06, 2011 | For: Watches, chronometers, clocks, watch bands, boxes of precious metal for watches in Class 014. |
| 4,065,322 | LES VOYAGES EXTRAORDINAIRES | Dec. 06, 2011 | For: Cuff links of precious or semi-precious metal, tie clips of precious or semi-precious metal, rings, bracelets, earrings, necklaces, brooches, key rings of precious metal, watches, chronometers, clocks; watch bands, boxes of precious metal for watches and jewelry in class 014. |
| 4,089,596 | NID DE PARADIS | Jan. 24, 2012 | For: Cufflinks, tie pins, rings, bracelets, earrings, necklaces, brooches, key holders of precious metals, watches, chronometers, wall clocks, watch bands, boxes of precious metal for watches and jewelry in class 014. |

| 4,103,554 | PERLEE | Feb. 28, 2012 | **For:** Jewelry featuring white gold and pink gold, but not featuring pearls or mother of pearl; horological and chronometric instruments featuring white gold and pink gold, but not featuring pearls or mother of pearl in class 014.<br>**For:** Bags, namely, handbags, evening handbags, clutch bags and tote bags in class 018. |
|---|---|---|---|
| 4,123,742 | OISEAUX DE PARADIS | Apr. 10, 2012 | **For:** Cuff links, tie clips, rings, bracelets, earrings, brooches, precious metal key rings; watches, chronometers, clocks, watch bands, boxes of precious metal for watches and jewelry in class 014. |
| 4,223,879 | COULEURS DE PARADIS | Oct. 16, 2012 | **For:** Cuff links, tie clips, rings, bracelets, earrings, necklaces, brooches, watches, chronometers, wall clocks, watch bands, boxes of precious metal for watches and jewelry in class 014. |
| 4,228,474 | PALAIS DE LA CHANCE | Oct. 23, 2012 | **For:** Jewelry, precious stones, precious metals and their alloys; pearls; jewelry cases; boxes of precious metal; horological and chronometric instruments; watches; chronometers; clocks; small clocks; watch cases in class 014. |
| 4,231,903 | YOUR POETIC SETTING | Oct. 30, 2012 | **For:** Cuff links, tie clips, rings, bracelets, earrings, necklaces, brooches, key rings of precious metals, watches, chronometers, |

| | | | |
|---|---|---|---|
| | | | clocks, watch bands, boxes of precious metal for watches and jewelry in class 014.<br><br>For: Setting services for jewelry, timepieces and optical goods, namely, selecting special gemstones in connection with jewelry making for others in the nature of custom manufacture of jewelry and jewelry mounting, including mounting jewelry incorporating precious stones, in the nature of custom construction of jewelry for others in class 040. |
| 4,653,258 |  | Dec. 09, 2014 | For: Jewelry in class 014. |
| 4,326,883 |  | Apr. 30, 2013 | For: Jewelry in class 014. |
| 4,362,694 | POETIC | Jul. 09, 2013 | For: Cuff links, tie clips, rings, bracelets, earrings, necklaces, brooches, key holders, watches, chronometers, clocks, watch bands, boxes of precious metal for watches and jewelry in class 014. |
| 4,445,589 | POETIC WISH | Dec. 10, 2013 | For: Jewelry; watches in class 014. |
| 4,634,782 | POETIC ASTRONOMY | Nov. 11, 2014 | For: Jewelry; watches in class 014. |
| 4,690,352 | MIDNIGHT PLANETARIUM | Feb. 24, 2015 | For: Jewelry; watches in class 014. |

| 4,690,356 | HEURES FILANTES | Feb. 24, 2015 | For: Jewelry products; watches in class 014. |
| 4,706,027 | POETIC COMPLICATIONS | Mar. 24, 2015 | For: Jewelry; watches in class 014. |

23.     Van Cleef & Arpels is the owner of the entire right, title and interest in and to the VAN CLEEF & ARPELS Trademarks.  The VAN CLEEF & ARPELS Trademarks have been used exclusively and continuously by Van Cleef & Arpels in the U.S., some since at least as early as 1939, and have never been abandoned.  The above registrations for the VAN CLEEF & ARPELS Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 4** are true and correct copies of the U.S. Registration Certificates for the VAN CLEEF & ARPELS Trademarks included in the above table.  The registrations for the VAN CLEEF & ARPELS Trademarks constitute *prima facie* evidence of their validity and of Van Cleef & Arpels' exclusive right to use the VAN CLEEF & ARPELS Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Panerai**

24.     Plaintiff OFFICINE PANERAI A.G. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at Hinterbergstrasse 22, 6312 Steinhausen, Switzerland ("Panerai").  Panerai is a subsidiary of Richemont.

25.     Panerai is an internationally recognized manufacturer, distributor and retailer of high precision watches and professional divers' instruments, all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including PANERAI (collectively, the "PANERAI Products").  PANERAI Products have become enormously popular and even iconic, driven by Panerai's arduous quality standards and innovative design.  Among the purchasing public, genuine PANERAI Products are instantly recognizable as such.  In the

United States and around the world, the Panerai brand has come to symbolize high quality, and PANERAI Products are among the most recognizable watches in the world.

26.     PANERAI Products are distributed and sold to consumers through boutiques and a highly selective worldwide network of authorized Panerai dealers, such as Tourneau located at 835 North Michigan Avenue in Chicago, Illinois.  Panerai also promotes its distinctive designs and the PANERAI trademarks on its official website at panerai.com.  The panerai.com website features proprietary content, images and designs exclusive to Panerai.

27.     Panerai incorporates a variety of distinctive marks in the design of its various PANERAI Products.  As a result of its long-standing use, Panerai owns common law trademark rights in its PANERAI trademarks.  Panerai has also registered its trademarks with the United States Patent and Trademark Office.  PANERAI Products typically include at least one of Panerai's registered trademarks.  Panerai uses its trademarks in connection with the marketing of its PANERAI Products, including the following marks which are collectively referred to as the "PANERAI Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 2,340,290 | PANERAI | April 11, 2000 | For:  Chronometers, watches in Class 014. |
| 2,362,908 | MARE NOSTRUM | June 27, 2000 | For:  Chronometers and watches in Class 014. |
| 2,418,830 | RADIOMIR | January 9, 2001 | For:  Chronometers; watches and clocks in Class 014. |
| 2,516,018 | LUMINOR | December 11, 2001 | For:  Chronometers, watches and clocks in Class 014. |
| 2,624,232 | SEALAND | September 24, 2002 | For:  Chronometers, watches in Class 014. |

| 3,004,529 |  | October 4, 2005 | For: Boxes and cases for watches; jewelry and precious stones, chronometers, watches and wall clocks in Class 014. |
|---|---|---|---|
| 3,035,995 | LUMINOR DAYLIGHT | December 27, 2005 | For: Watches, chronometers in Class 014. |
| 3,174,281 | MARINA MILITARE | November 21, 2006 | For: Cuff links, tie pins, rings, bracelets, earrings, necklaces, brooches; watches, chronometers, clocks, watchbands, wristwatches, boxes of precious metal for watches and jewelry in Class 014. |
| 3,178,943 |  | December 5, 2006 | For: Watches in Class 014. |
| 3,756,691 |  | March 9, 2010 | For: Watches in Class 014. |
| 3,857,560 | ZEROGRAPH | October 5, 2010 | For: Watches, chronometers in Class 014 |
| 3,882,739 | RADIOMIR COMPOSITE | November 30, 2010 | For: Cuff-links, tie clips, rings, bracelets, earrings, necklaces, brooches in the nature of jewellery, key rings of precious metal; watches, chronometers, clocks, watch straps, watch bracelets, boxes of precious |

| | | | |
|---|---|---|---|
| | | | metals for watches and jewellery in Class 014. |
| 3,889,408 | LUMINOR COMPOSITE | December 14, 2010 | For: Cuff-links, tie clips, rings, bracelets, earrings, necklaces, brooches being jewellery, key rings of precious metal; watches, chronometers, clocks, watch straps, watch bracelets, boxes of precious metals for watches and jewellery in Class 014. |
| 3,927,967 | LO SCIENZIATO | March 8, 2011 | For: Cufflinks, tie clips, rings, bracelets, earrings, necklaces, brooches, key holders of precious metal, watches, stopwatches, wall clocks, watch straps, boxes of precious metal for watches and jewelry in Class 014. |
| 3,942,579 |  | April 12, 2011 | For: Watches in Class 014. |
| 3,947,004 | PANERAI COMPOSITE | April 19, 2011 | For: Watches, chronometers, watch straps, watch bracelets, boxes of precious metal for watches in Class 014. |
| 4,009,035 | OFFICINE PANERAI | August 9, 2011 | For: Chronometers, watches and clocks; watch accessories, namely, watch bands, watch straps, watch bracelets, and buckles for watch bands and watch straps; boxes and cases for watches; watch cases, namely, watch rolls in Class 014.<br><br>For: Sport bags; holdalls for yachting equipment and apparel |

| | | | | in Class 018. |
|---|---|---|---|---|
| | | | | For: Clothing, namely, t-shirts, wind-resistant jackets, jackets, vests, sweaters, polo shirts, long sleeve shirts, scarves; headwear, hats, caps in Class 025. |

28.     The PANERAI Trademarks have been used exclusively and continuously by Panerai and/or its predecessors-in-interest and associated companies in the U.S., some since at least as early as 2000, and have never been abandoned.  The above registrations for the PANERAI Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 5** are true and correct copies of the U.S. Registration Certificates for the PANERAI Trademarks included in the above table.  The registrations for the PANERAI Trademarks constitute *prima facie* evidence of their validity and of Panerai's exclusive right to use the PANERAI Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Lancel**

29.     Plaintiff LANCEL INTERNATIONAL SA is a corporation organized and existing under the laws of Switzerland, having its principal place of business at 10 Route des Biches, 1752 Villars-sur-Glane, Switzerland ("Lancel").  Lancel is a subsidiary of Richemont.

30.     Lancel is an internationally recognized manufacturer, distributor and retailer of high-quality handbags, small leather goods, jewelry, accessories and other goods, all of which prominently display its famous, internationally-recognized and federally-registered trademarks, including LANCEL (collectively, the "LANCEL Products").  LANCEL Products have become enormously popular, driven by Lancel's arduous quality standards and innovative design.  Among the purchasing public, genuine LANCEL Products are instantly recognizable as such.  In the United States and around the world, the Lancel brand has come to symbolize high quality, and LANCEL Products are among the most recognizable handbags in the world.

31.     LANCEL Products are distributed and sold to consumers through its own boutiques worldwide and have been sold through department stores in the United States.  Lancel also promotes the LANCEL Products online at lancel.com.  The lancel.com website features proprietary content, images and designs exclusive to Lancel.

32.     Lancel incorporates a variety of distinctive marks in the design of its various LANCEL Products.  As a result of its long-standing use, Lancel owns common law trademark rights in its LANCEL Trademarks.  Lancel has also registered its trademarks with the United States Patent and Trademark Office.   LANCEL Products typically include at least one of Lancel's registered trademarks.  Lancel uses its trademarks in connection with the marketing of its LANCEL Products, including the following marks which are collectively referred to as the "LANCEL Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,018,836 | LANCEL | Aug. 26, 1975 | For: Travel articles-namely, beauty cases, vanity cases, toilette kits, all sold empty in class 018. |
| 1,394,869 | LANCEL | May 27, 1986 | For: Suitcases, trunks, overnight bags, travel bags, tote bags, garment bags for travel carry-on cases, attache cases, briefcases, handbags, change purses, pouches, billfolds, wallets, business and credit card cases, and keyholders sold empty and made from leather, imitation leather, or  substitutes therefor, and for umbrellas in class 018. |
| 1,538,009 | LANCEL | May 9, 1989 | For: Watches in class 014.

For: Clothing items made of |

| | | | |
|---|---|---|---|
| | | | silk-namely, scarves, ties, foulards, and saches; belts with buckles in class 025. |
| 1,775,836 | LANCEL | June 8, 1993 | For: Jewelry in class 014. |
| 3,527,709 |  | Nov. 4, 2008 | For: Soaps; perfumery, essential oils, cosmetics, hair lotions in class 003.<br><br>For: Spectacles, sunglasses, spectacle frames, spectacle cases, magnifying glasses in class 009.<br><br>For: Cuff links, tie pins, rings, bracelets, earrings, necklaces, brooches; watches, chronometers, wall clocks, watch bands, cases of precious metal for watches and jewellery in class 014.<br><br>For: Fountain pens; ballpoint pens, pencils and pencil holders; felt pens; rollerball pens; markers; gift covers and packing materials for writing instruments consisting of pouches and boxes; writing ink and ink cartridges for pens; paper for writing; calendars; paperweights; office requisites in the nature of rubber band holders, ink blotters, adhesive tape holders, and paper clip holders; storage cases and boxes for pens and writing instruments; posters; leaflets, prospectuses, and printed reviews all featuring information on fashion, style and luxury in class 016. |

| | | | For: Leather items and small leather items, namely, handbags, pochettes, holdalls, beggars' bags, shoulder bags, rucksacks, college satchels, beach bags, travelling bags, saddle bags, sports bags, garment bags, travelling sets consisting of leather traveling bags, document cases, card wallets, wallets, binder note-cases, purses not of precious metal, briefcases, school bags, purses, driving license cases of animal skins and hides or leather, leather pouches, visiting card cases and holders of animal skins and hides or leather, key cases, beauty cases, vanity cases sold empty; trunks and suitcases, suitcases; and umbrellas in class 018. For: Clothing, namely, sportswear in the nature of sports shirts, sports shoes, and sports shorts and pants; sashes for wear; shawls; scarves; ties; braces; gloves; belts; footwear, other than orthopaedic footwear; headgear in the nature of hats and caps in class 025. |
|---|---|---|---|

33.     The LANCEL Trademarks have been used by Lancel for many years and have never been abandoned.   The above registrations for the LANCEL Trademarks are valid, subsisting, in full force and effect, and many are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 6** are true and correct copies of the U.S. Registration Certificates for the LANCEL Trademarks included in the above table.   The registrations for the LANCEL

Trademarks constitute *prima facie* evidence of their validity and of Lancel's exclusive right to use the LANCEL Trademarks pursuant to 15 U.S.C. § 1057(b).

**Plaintiff Richemont International S.A.**

34.     Plaintiff RICHEMONT INTERNATIONAL S.A. is a corporation organized and existing under the laws of Switzerland, having its principal place of business at 10 Route des Biches, 1752 Villars-sur-Glane, Switzerland ("Richemont International S.A."). Richemont International S.A. is a subsidiary of Richemont.

35.     Richemont International S.A.'s Maisons or house brands include several of the most prestigious names in the luxury timepiece and jewelry industry: IWC Schaffhausen, Piaget, Baume & Mercier, Jaeger-LeCoultre, and Vacheron Constantin.

**Maison IWC**

36.     IWC was established nearly 150 years ago in Schaffhausen, Switzerland by the American Florentine Ariosto Jones, a watchmaker from Boston, Massachusetts. His initial aim: to produce high-quality pocket watches for the American market. Since then, the IWC Swiss watch manufacturers have been creating masterpieces of haute horlogerie that combine precision engineering with exclusive design ("IWC Products"). IWC was acquired by Richemont International S.A. in 2000.

37.     IWC Products are sold worldwide at fine jewelers and department stores, including Torneau located at 835 N. Michigan Avenue in Chicago. IWC Products are also promoted online at iwc.com. The iwc.com website features proprietary content, images and designs exclusive to IWC and Richemont International S.A.

38.     IWC incorporates a variety of distinctive marks in the design of its various IWC Products. IWC Products typically include at least one IWC registered trademark. IWC uses its

trademarks in connection with the marketing of its IWC Products, including the following marks which are collectively referred to as the "IWC Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 576,647 | *International Watch Co* SCHAFFHAUSEN | June 30, 1953 | For: Watch movements, cases, dials, and sheaths in class 014. |
| 1,205,403 | IWC | August 17, 1982 | For: Watches in class 014. |
| 2,516,587 | IWC *International Watch Co Schaffhausen* | December 11, 2001 | For: Watches in class 014. |
| 3,507,947 | IWC PORTUGIESER | September 30, 2008 | For: Watches in class 014. |
| 2,479,518 | PROBUS I.W.C. SCAFUSIA | August 21, 2001 | For: Watches in class 014. |
| 4,270,382 | IWC SCHAFFHAUSEN | January 8, 2013 | For: Cuff links, tie clips, rings, bracelets, earrings, necklaces, brooches, key rings made of precious metals, watches, chronometers, clocks; straps for wristwatches, boxes of precious metal for watches and jewelry, alarm clocks; all the aforementioned goods from Switzerland in class 014.<br><br>For: Advertising services; business management; business administration; dissemination of advertising matter; procurement, namely, purchasing watches and chronometers and components thereof for others; providing online and retail store services in the field of watches, |

| | | | |
|---|---|---|---|
| | | | chronometers, and luxury goods; commercial information and advice for consumers; demonstration of goods; direct mail advertising services; auctioneering; organization of exhibitions for commercial or advertising purposes; organization of trade fairs for commercial or advertising purposes; sales promotion for others; publication of publicity texts; on-line advertising on a computer network; public relations; news clipping services; the bringing together, for the benefit of others, of a variety of goods enabling customers to conveniently view and purchase those goods from a store in the field of watches, chronometers, and luxury goods; the bringing together, for the benefit of others, of a variety of goods enabling customers to conveniently view and purchase those goods by E-mail and telecommunications in the field of watches, chronometers, and luxury goods; the bringing together, for the benefit of others, of a variety of goods enabling customers to conveniently view and purchase those goods from an Internet site in the field of watches, chronometers, and luxury goods in class 035. |
| 4,370,399 | IWC INTERNATIONAL WATCH CO. SCHAFFHAUSEN SWITZERLAND, SINCE 1868 | July 23, 2013 | For: Cuff links, tie clips, rings, bracelets, earrings, necklaces, brooches, key rings of precious metals, watches, chronometers, clocks; watch straps, boxes of precious metal for watches and jewelry, alarm clocks; all the aforementioned goods of Swiss |

| | | | |
|---|---|---|---|
| | | | origin in class 014.<br><br>For: Providing online and retail store services in the field of watches and chronometers in class 035. |
| 4,562,021 | IWC SAFEDIVE | July 8, 2014 | For: Cuff links; tie clips; rings; bracelets; earrings; necklaces; brooches; key rings of precious metal; timepieces and chronometric instruments; watches; chronometers; wall clocks; watch cases; dials for clock and watch making; movements for timepieces; alarm clocks; watch straps; boxes of precious metal for watches and jewelry in class 014. |
| 4,322,600 | IWC | April 23, 2013 | For: Soap; perfumery, essential oils, cosmetics, hair lotions in class 003.<br><br>For: Flatware; knives, forks, and spoons in class 008.<br><br>For: Spectacles, sunglasses, spectacle cases; measuring instruments, namely, barometers, hygrometers, and thermometers; divers' masks; apparatus for games adapted for use with an external display screen or monitor in class 009.<br><br>For: Bicycles in class 012.<br><br>For: Watches, chronometers, clocks, watch bands, boxes of precious metal for watches in class 014.<br><br>For: Books and magazines in the field of watches and luxury goods; agendas in class 016. |

For: Bags, namely, travel bags, briefcases, and handbags; traveling sets comprised of suitcases and travel bags; wallets; card cases for business cards and credit cards in class 018.

For: Clothing, namely, shirts, tops, scarves, neckties, and hats in class 025.

For: Games, namely, board games, manipulative games, machines for games of chance; gymnastic apparatus; sporting articles, namely, equestrian polo mallets and balls, and golf clubs, golf balls, and golf accessories, namely, golf accessory pouches, golf bag covers, golf bag pegs, golf bag tags, golf bags with and without wheels, golf ball markers, golf ball retrievers, golf ball sleeves, golf club bags, golf club covers, golf club grips, golf club heads, golf club holders for use on a driving range or golf course, golf club inserts, golf club shafts, golf flags, golf gloves, golf irons, golf putter covers, golf putters, golf tees, golf towel clips for attachment to golf bags; scale-model vehicles, swim fins, remote control toy vehicles; toys, namely, plush toys, mechanical toys, dolls, and toy building blocks in class 028.

For: Tobacco, cigarettes, cigarillos, cigars; lighters for smokers; smokers' articles, namely, cigarette holders, cases and lighters all not made of precious metal, ashtrays, and pipes in class 034.

| | | | For: Advertising services; business management; business administration; dissemination of advertising matter; procurement, namely, purchasing watches and chronometers and components thereof for others; providing online and retail store services in the field of watches, chronometers, and luxury goods; commercial information and advice for consumers; demonstration of goods; direct mail advertising services; auctioneering; organization of exhibitions for commercial or advertising purposes; organization of trade fairs for commercial or advertising purposes; sales promotion for others; publication of publicity texts; on-line advertising on a computer network; public relations; news clipping services; the bringing together, for the benefit of others, of a variety of goods enabling customers to conveniently view and purchase those goods from a store in the field of watches, chronometers, and luxury goods; the bringing together, for the benefit of others, of a variety of goods enabling customers to conveniently view and purchase those goods by E-mail and telecommunications in the field of watches, chronometers, and luxury goods; the bringing together, for the benefit of others, of a variety of goods enabling customers to conveniently view and purchase those goods from an Internet site in the field of watches, chronometers, and luxury goods in class 035. |
|---|---|---|---|

39.     Richemont International S.A. is the owner of the entire right, title and interest in and to the IWC Trademarks.  The IWC Trademarks have been used exclusively and continuously by IWC in the U.S., some since at least as early as 1901, and have never been abandoned.  The above registrations for the IWC Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 7** are true and correct copies of the U.S. Registration Certificates for the IWC Trademarks included in the above table.  The registrations for the IWC Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the IWC Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Piaget**

40.     The Piaget brand was established in Switzerland in 1874 and is well-known as a master of ultra-thin watch movement construction.   Part of Richemont International S.A. since 1988, Piaget also has an established reputation in the jewelry field.  Since the Piaget Maison was established, Piaget has sold and distributed watches, watch parts and watch movements, clocks, chronometers, jewelry and other luxury goods (the "PIAGET Products").

41.     PIAGET Products are sold in Piaget boutiques and through other authorized retailers, including Trabert & Hoeffer in Chicago, Illinois.  Since at least as early as 1997, Piaget has operated a website where it promotes and sells genuine PIAGET Products at piaget.com. The piaget.com website features proprietary content, images and designs exclusive to Piaget and Richemont International S.A.

42.     Piaget incorporates a variety of distinctive marks in the design of its various PIAGET Products.  PIAGET Products typically include at least one Piaget registered trademark.

Piaget uses its trademarks in connection with the marketing of its PIAGET Products, including the following marks which are collectively referred to as the "PIAGET Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 679,984 | **PIAGET** | June 6, 1959 | For: Complete watches, WATCHES, LARGE CLOCKS, PENDULUMS in Class 014. |
| 742,354 | PIAGET | Dec. 18, 1962 | For: Watches, watch parts and watch movements in Class 014. |
| 2,464,407 | **PIAGET ALTIPLANO** | June 26, 2001 | For: Watches, clocks and chronometers in Class 014. |

43.     Richemont International S.A. is the owner of the entire right, title and interest in and to the PIAGET Trademarks.  The PIAGET Trademarks have been used exclusively and continuously by Piaget in the U.S., some since at least as early as 1959, and have never been abandoned.  The above registrations for the PIAGET Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 8** are true and correct copies of the U.S. Registration Certificates for the PIAGET Trademarks included in the above table.  The registrations for the PIAGET Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the PIAGET Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Baume & Mercier**

44.     For many decades, Baume & Mercier and its predecessors-in-interest have been engaged in the manufacture and sale of watches, watch cases, watch movements, clocks, chronometers, and related goods (the "BAUME & MERCIER Products").

45.     The Baume & Mercier Maison, first established in 1830 as Baume, has received numerous accolades throughout its history.  Part of Richemont International S.A. since 1988, the Baume & Mercier brand's reputation for quality and style continues to this day.

46.     BAUME & MERCIER Products are sold at fine jewelers and department stores, including Torneau located at 835 N. Michigan Avenue and Marshall Pierce & Co. located at 29 E. Madison Street in Chicago, Illinois.  Since at least as early as 1995, Baume & Mercier has operated a website where it promotes genuine BAUME & MERCIER Products at baume-et-mercier.com.   The baume-et-mercier.com website features proprietary content, images and designs exclusive to Baume & Mercier and Richemont International S.A.

47.     Baume & Mercier incorporates a variety of distinctive marks in the design of its various BAUME & MERCIER Products.  BAUME & MERCIER Products typically include at least one Baume & Mercier registered trademark.  Baume & Mercier uses its trademarks in connection with the marketing of its BAUME & MERCIER Products, including the following marks which are collectively referred to as the "BAUME & MERCIER Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,081,643 | $\Phi$ <br> **BAUME & MERCIER** <br> GENEVE | January 10, 1978 | For:  Watches, watch cases and watch movements in class 014. |
| 1,638,818 | **BAUME & MERCIER** | March 26, 1991 | For:  Clocks, watches and chronometers in class 014. |

| 2,020,357 | BAUME & MERCIER LINEA | December 3, 1996 | For: Mechanical watches with manual and automatic winding; electric and electronic watches, movements, cases, dials, watch bands; diver's watches, chronometers; stop watches; clocks, travel clocks and electric and electronic alarm clocks, or with manual winding; jewel watches in class 014. |
| 3,371,339 | BAUME & MERCIER GENEVE | January 22, 2008 | For: Watches, watch cases in class 014. |

48.    Richemont International S.A. is the owner of the entire right, title and interest in and to the BAUME & MERCIER Trademarks. The BAUME & MERCIER Trademarks have been used exclusively and continuously by Baume & Mercier in the U.S., some since at least as early as 1946, and have never been abandoned. The above registrations for the BAUME & MERCIER Trademarks are valid, subsisting, in full force and effect, and all are incontestable pursuant to 15 U.S.C. § 1065. Attached hereto as **Exhibit 9** are true and correct copies of the U.S. Registration Certificates for the BAUME & MERCIER Trademarks included in the above table. The registrations for the BAUME & MERCIER Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the BAUME & MERCIER Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Jaeger-LeCoultre**

49.    Since its founding in 1833, Jaeger-LeCoultre has been at the forefront of invention and innovation in fine watchmaking and is now part of Richemont International S.A. Jaeger-LeCoultre sells and distributes watches and clocks (the "JAEGER-LECOULTRE Products") and has obtained hundreds of patents.

50.     JAEGER-LECOULTRE Products are sold via Jaeger-LeCoultre boutiques and fine jewelers, including Marshall Pierce & Co., Torneau, and Trabert & Hoeffer in Chicago, Illinois.  Since at least as early as 2000, Jaeger-LeCoultre has operated a website where it promotes and sells genuine JAEGER-LECOULTRE Products at jaeger-lecoultre.com.  The jaeger-lecoultre.com website features proprietary content, images and designs exclusive to Jaeger-LeCoultre and Richemont International S.A.

51.     Jaeger-LeCoultre incorporates a variety of distinctive marks in the design of its various JAEGER-LECOULTRE Products.  JAEGER-LECOULTRE Products typically include at least one Jaeger-LeCoultre registered trademark.  Jaeger-LeCoultre uses its trademarks in connection with the marketing of its JAEGER-LECOULTRE Products, including the following marks which are collectively referred to as the "JAEGER-LECOULTRE Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 1,339,139 | **JAEGER-LECOULTRE** | June 4, 1985 | For: Watches and clocks except dashboard clocks for land vehicles, boats and planes in Class 014. |
| 1,402,084 | JAEGER-LECOULTRE | July 22, 1986 | For: Watches and clocks except dashboard clocks for land vehicles, boats and planes in Class 014. |

52.     Richemont International S.A. is the owner of the entire right, title and interest in and to the JAEGER-LECOULTRE Trademarks.  The JAEGER-LECOULTRE Trademarks have been used exclusively and continuously by Jaeger-LeCoultre in the U.S., some since at least as early as 1968, and have never been abandoned.  The above registrations for the JAEGER-LECOULTRE Trademarks are valid, subsisting, in full force and effect, and both are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 10** are true and correct copies of the U.S. Registration Certificates for the JAEGER-LECOULTRE Trademarks included

in the above table. The registrations for the JAEGER-LECOULTRE Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the JAEGER-LECOULTRE Trademarks pursuant to 15 U.S.C. § 1057(b).

**Maison Vacheron Constantin**

53.     Since its founding in 1755, Vacheron Constantin has been involved in the sale and distribution of watches, chronometers, clocks, jewelry, and related goods (the "VACHERON CONSTANTIN Products"). Vacheron Constantin became part of Richemont International S.A. in 1996.

54.     VACHERON CONSTANTIN Products are sold through Vacheron Constantin boutiques and a network of authorized retailers, including Trabert & Hoeffer in Chicago, Illinois. VACHERON CONSTANTIN Products are also promoted online at vacheron-constantin.com. The vacheron-constantin.com website features proprietary content, images and designs exclusive to Vacheron Constantin and Richemont International S.A.

55.     Vacheron Constantin incorporates a variety of distinctive marks in the design of its various VACHERON CONSTANTIN Products. VACHERON CONSTANTIN Products typically include at least one of the Vacheron Constantin registered trademarks. Vacheron Constantin uses its trademarks in connection with the marketing of its VACHERON CONSTANTIN Products, including the following marks which are collectively referred to as the "VACHERON CONSTANTIN Trademarks."

| REGISTRATION NUMBER | REGISTERED TRADEMARK | REGISTRATION DATE | INTERNATIONAL CLASSES |
|---|---|---|---|
| 2,125,672 | *Overseas* | December 30, 1997 | For: Jewelry, cufflinks, precious gemstones, clocks, watches, chronometers and their parts in Class 014. |

| 2,965,541 | PATRIMONY | July 12, 2005 | For: Watches in class 014. |
|---|---|---|---|
| 3,114,414 | ✳ VACHERON CONSTANTIN | July 11, 2006 | For: Cuff links, tie pins, rings, bracelets, earrings, necklaces, brooches; watches, chronometers, clocks, watchstraps, cases of precious metal for watches and jewellery in Class 014. |
| 3,807,756 | QUAI DE L'ILE | June 22, 2010 | For: Watches, chronometers, watch straps, watch bracelets in class 014. |
| 4,564,316 | ✠ | July 8, 2014 | For: Watches and chronometers in class 014. |

56.    Richemont International S.A. is the owner of the entire right, title and interest in and to the VACHERON CONSTANTIN Trademarks.  The VACHERON CONSTANTIN Trademarks have been used exclusively and continuously by Vacheron Constantin in the U.S. since at least as early as 2006 and have never been abandoned.  The above registrations for the VACHERON CONSTANTIN Trademarks are valid, subsisting, in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065.  Attached hereto as **Exhibit 11** are true and correct copies of the U.S. Registration Certificates for the VACHERON CONSTANTIN Trademarks included in the above table.  The registrations for the VACHERON CONSTANTIN Trademarks constitute *prima facie* evidence of their validity and of Richemont International S.A.'s exclusive right to use the VACHERON CONSTANTIN Trademarks pursuant to 15 U.S.C. § 1057(b).

47

**Plaintiffs' Trademarks and Plaintiffs' Products**

57.     The CARTIER Trademarks, MONTBLANC Trademarks, CHLOE Trademarks, VAN CLEEF & ARPELS Trademarks, PANERAI Trademarks, LANCEL Trademarks, IWC Trademarks, PIAGET Trademarks, BAUME & MERCIER Trademarks, JAEGER-LECOULTRE Trademarks, and VACHERON CONSTANTIN Trademarks are collectively referred to herein as "Plaintiffs' Trademarks."

58.     The CARTIER Products, MONTBLANC Products, CHLOE Products, VAN CLEEF & ARPELS Products, PANERAI Products, LANCEL Products, IWC Products, PIAGET Products, BAUME & MERCIER Products, JAEGER-LECOULTRE Products, and VACHERON CONSTANTIN Products are collectively referred to herein as "Plaintiffs' Products."

59.     Plaintiffs' Trademarks are exclusive to Plaintiffs, and are displayed extensively on Plaintiffs' Products and in Plaintiffs' marketing and promotional materials.  Plaintiffs' Products have long been among the most popular luxury products in the world and have been extensively promoted and advertised at great expense.  In fact, Plaintiffs have expended millions of dollars annually in advertising, promoting and marketing featuring their respective Plaintiffs' Trademarks.  Plaintiffs' Products have also been the subject of extensive unsolicited publicity resulting from their high-quality, innovative designs and renown as desired luxury items. Because of these and other factors, Plaintiffs' respective brands and many of Plaintiffs' Trademarks have become famous.

60.     Plaintiffs' Trademarks are distinctive when applied to Plaintiffs' Products, signifying to the purchaser that the products come from Plaintiffs and are manufactured to Plaintiffs' quality standards.  Whether Plaintiffs manufacture the products themselves or license others to do so, Plaintiffs have ensured that products bearing their trademarks are manufactured

to the highest quality standards. Many of Plaintiffs' Trademarks have achieved tremendous fame and recognition, which has only added to the inherent distinctiveness of their respective marks. As such, the goodwill associated with Plaintiffs' Trademarks is of incalculable and inestimable value to Plaintiffs.

61.     Plaintiffs have expended substantial time, money, and other resources in developing, advertising and otherwise promoting Plaintiffs' Trademarks. As a result, Plaintiffs' Products bearing Plaintiffs' Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Plaintiffs. Each Plaintiff runs a multi-million dollar operation, and Plaintiffs' Products have become among the most popular of their kind in the world.

**The Defendants**

62.     Defendants are individuals and business entities who, upon information and belief, reside in the People's Republic of China or other foreign jurisdictions. Defendants conduct business throughout the United States, including within the State of Illinois and this Judicial District, through the operation of the fully interactive commercial websites and online marketplaces operating under the Defendant Internet Stores. Each Defendant targets the United States, including Illinois, and has offered to sell, and, on information and belief, has sold and continues to sell Counterfeit Products to consumers within the United States, including the State of Illinois.

63.     On information and belief, Defendants are an interrelated group of counterfeiters working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell products bearing counterfeit versions of Plaintiffs' Trademarks in the same transaction, occurrence, or series of transactions or occurrences. Tactics used by Defendants to

conceal their identities and the full scope of their counterfeiting operation make it virtually impossible for Plaintiffs to learn Defendants' true identities and the exact interworking of their massive counterfeit network. In the event that Defendants provide additional credible information regarding their identities, Plaintiffs will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

64. The overwhelming success of Plaintiffs' respective brands has resulted in their significant counterfeiting. Consequently, Plaintiffs have a worldwide anti-counterfeiting program and regularly investigate suspicious websites and online marketplace listings identified in proactive Internet sweeps and reported by consumers. In recent years, Plaintiffs have identified thousands of domain names linked to fully interactive websites and marketplace listings on platforms such as iOffer and Aliexpress, including the Defendant Internet Stores, which were offering for sale, selling, and importing Counterfeit Products to consumers in this Judicial District and throughout the United States. Despite Plaintiffs' enforcement efforts online and on the ground, Defendants have persisted in creating the Defendant Internet Stores, which generate massive profits selling Counterfeit Products. Internet websites like the Defendant Internet Stores are estimated to receive tens of millions of visits per year and to generate over $135 billion in annual online sales. According to an intellectual property rights seizures statistics report issued by Homeland Security, the manufacturer's suggested retail price (MSRP) of goods seized by the U.S. government in fiscal year 2014 was over $1.23 billion. Internet websites like the Defendant Internet Stores are also estimated to contribute to tens of thousands of lost jobs for legitimate businesses and broader economic damages such as lost tax revenue every year.

65.     Defendants facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine Plaintiffs' Products.  Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards, Western Union and PayPal.  Numerous Defendant Domain Names also incorporate the Plaintiffs' Trademarks into the URL, and the Defendant Internet Stores often include content and design elements that make it very difficult for consumers to distinguish such counterfeit sites from an authorized website.  Defendants further perpetuate the illusion of legitimacy by offering "live 24/7" customer service and using indicia of authenticity and security that consumers have come to associate with authorized retailers, including the McAfee® Security, VeriSign®, Visa®, MasterCard®, and PayPal® logos.  Plaintiffs have not licensed or authorized Defendants to use any of Plaintiffs' Trademarks, and none of the Defendants are authorized retailers of genuine Plaintiffs' Products.

66.     Defendants also deceive unknowing consumers by using Plaintiffs' Trademarks without authorization within the content, text, and/or meta tags of their websites in order to attract various search engines crawling the Internet looking for websites relevant to consumer searches for Plaintiffs' Products.  Additionally, upon information and belief, Defendants use other unauthorized search engine optimization (SEO) tactics and social media spamming so that the Defendant Internet Stores listings show up at or near the top of relevant search results and misdirect consumers searching for genuine Plaintiffs' Products.  Further, Defendants utilize similar illegitimate SEO tactics to propel new domain names to the top of search results after others are shut down.  As such, Plaintiffs also seek to disable Defendant Domain Names owned by Defendants that are the means by which the Defendants could continue to sell Counterfeit Products.

67.     Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of Defendant Internet Stores.   For example, many of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete, contain randomly typed letters, or fail to include cities or states.   Other Defendant Domain Names use privacy services that conceal the owners' identity and contact information.   On information and belief, Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. Such Defendant Internet Store registration patterns are one of many common tactics used by the Defendants to conceal their identities, the full scope and interworking of their massive counterfeiting operation, and to avoid being shut down.

68.     Even though Defendants operate under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores.   For example, many of the Defendant websites have virtually identical layouts, even though different aliases were used to register the respective domain names.   In addition, Counterfeit Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.   The Defendant Internet Stores also include other notable common features, including use of the same domain name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, illegitimate SEO tactics, HTML user-defined variables, domain redirection, lack of contact information, identically or similarly priced items and volume sales discounts, the same incorrect grammar and

misspellings, similar hosting services, similar name servers, and the use of the same text and images, including content copied from Plaintiffs' official websites.

69.     In addition to operating under multiple fictitious names, Defendants in this case and defendants in other similar cases against online counterfeiters use a variety of other common tactics to evade enforcement efforts.  For example, counterfeiters like Defendants will often register new domain names or online marketplace accounts under new aliases once they receive notice of a lawsuit.  Counterfeiters also often move website hosting to rogue servers located outside the United States once notice of a lawsuit is received.  Rogue servers are notorious for ignoring take down demands sent by brand owners.  Counterfeiters also typically ship products in small quantities via international mail to minimize detection by U.S. Customs and Border Protection.  A 2012 U.S. Customs and Border Protection report on seizure statistics indicated that the Internet has fueled "explosive growth" in the number of small packages of counterfeit goods shipped through the mail and express carriers.

70.     Further, counterfeiters such as Defendants typically operate multiple credit card merchant accounts and PayPal accounts behind layers of payment gateways so that they can continue operation in spite of Plaintiffs' enforcement efforts.  On information and belief, Defendants maintain off-shore bank accounts and regularly move funds from their PayPal accounts to off-shore bank accounts outside the jurisdiction of this Court.  Indeed, analysis of PayPal transaction logs from previous similar cases indicates that off-shore counterfeiters regularly move funds from U.S.-based PayPal accounts to China-based bank accounts outside the jurisdiction of this Court.

71.     Defendants, without any authorization or license from Plaintiffs, have knowingly and willfully used and continue to use Plaintiffs' Trademarks in connection with the

advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States and Illinois over the Internet. Each Defendant Internet Store offers shipping to the United States, including Illinois, and, on information and belief, each Defendant has sold Counterfeit Products into the United States, including Illinois.

72.     Defendants' use of Plaintiffs' Trademarks in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into Illinois, is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiffs.

**COUNT I**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)**

73.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 72.

74.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the federally registered Plaintiffs' Trademarks in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods. Plaintiffs' Trademarks are highly distinctive marks. Consumers have come to expect the highest quality from Plaintiffs' Products sold or marketed under Plaintiffs' Trademarks.

75.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products bearing counterfeit reproductions of Plaintiffs' Trademarks without Plaintiffs' permission.

76.     Plaintiffs are the exclusive owners of their respective Plaintiffs' Trademarks. Plaintiffs' United States Registrations for Plaintiffs' Trademarks (Exhibits 1-11) are in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiffs' rights in

Plaintiffs' Trademarks, and are willfully infringing and intentionally using counterfeits of one or more of Plaintiffs' Trademarks. Defendants' willful, intentional and unauthorized use of Plaintiffs' Trademarks is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

77.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

78.     Plaintiffs have no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the goodwill of Plaintiffs' Trademarks.

79.     The injuries and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offering to sell, and sale of Counterfeit Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

80.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 79.

81.     Defendants' promotion, marketing, offering for sale, and sale of Counterfeit Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiffs or the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiffs.

82.     By using Plaintiffs' Trademarks on the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Counterfeit Products.

83.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Counterfeit Products to the general public is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

84.     Plaintiffs have no adequate remedy at law and, if Defendants' actions are not enjoined, Plaintiffs will continue to suffer irreparable harm to their reputations and the goodwill of Plaintiffs' respective brands.

## COUNT III
## CLAIM FOR INJUNCTIVE RELIEF UNDER THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT (15 U.S.C. § 1125(d)) AS TO THE DEFENDANTS OPERATING A DEFENDANT DOMAIN NAME INCORPORATING ANY OF PLAINTIFFS' TRADEMARKS

85.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 84.

86.     Plaintiffs are the exclusive owners of their respective Plaintiffs' Trademarks.  The U.S. Registrations for Plaintiffs' Trademarks (Exhibits 1-11) are in full force and effect. Additionally, Plaintiffs' Trademarks are highly distinctive and many are famous marks pursuant to 15 U.S.C. § 1125 and were famous before and at the time of the registration of the Defendant Domain Names.

87.     Upon information and belief, Defendants operating a Defendant Domain Name incorporating any of Plaintiffs' Trademarks have acted with bad faith intent to profit from the unauthorized use of Plaintiffs' Trademarks and the goodwill associated therewith by registering, trafficking in, or using various domain names which are identical to, confusingly similar to, or dilutive of Plaintiffs' Trademarks.

88.     Defendants have no intellectual property rights in or to Plaintiffs' Trademarks.

89.     Defendants' actions constitute willful cybersquatting in violation of §43(d) of the Lanham Act, 15 U.S.C. §1125(d).

90.     Plaintiffs have no adequate remedy at law, and the registration and use of the Defendant Domain Names incorporating Plaintiffs' Trademarks has caused, is causing, and is likely to continue to cause substantial and irreparable injury to the public and to Plaintiffs.

**COUNT IV**
**VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(815 ILCS § 510, *et seq.*)**

91.     Plaintiffs hereby re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 90.

92.     Defendants have engaged in acts violating Illinois law including, but not limited to, passing off their Counterfeit Products as those of Plaintiffs, causing a likelihood of confusion and/or misunderstanding as to the source of their goods, causing a likelihood of confusion and/or misunderstanding as to an affiliation, connection, or association with genuine Plaintiffs' Products, representing that their products have Plaintiffs' approval when they do not, and engaging in other conduct which creates a likelihood of confusion or misunderstanding among the public.

93.     The foregoing Defendants' acts constitute a willful violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, *et seq*.

94.     Plaintiffs have no adequate remedy at law, and Defendants' conduct has caused Plaintiffs to suffer damage to their reputations and associated goodwill.  Unless enjoined by the Court, Plaintiffs will suffer future irreparable harm as a direct result of Defendants' unlawful activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using Plaintiffs' Trademarks or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a genuine Plaintiffs' Product or is not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a genuine Plaintiffs' Product or any other product produced by Plaintiffs, that is not Plaintiffs' or not produced under the authorization, control, or supervision of Plaintiffs and approved by Plaintiffs for sale under Plaintiffs' Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control or supervision of Plaintiffs, or are sponsored by, approved by, or otherwise connected with Plaintiffs;

   d. further infringing Plaintiffs' Trademarks and damaging Plaintiffs' goodwill;

   e. otherwise competing unfairly with Plaintiffs in any manner;

   f. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiffs, nor authorized by Plaintiffs to be sold or offered for sale, and which bear any Plaintiffs' trademark,

including Plaintiffs' Trademarks, or any reproductions, counterfeit copies or colorable imitations thereof;

g. using, linking to, transferring, selling, exercising control over, or otherwise owning the Online Marketplace Accounts, the Defendant Domain Names, or any other domain name or online marketplace account that is being used to sell or is the means by which Defendants could continue to sell Counterfeit Products; and

h. operating and/or hosting websites at the Defendant Domain Names and any other domain names registered or operated by Defendants that are involved with the distribution, marketing, advertising, offering for sale, or sale of any product bearing Plaintiffs' Trademarks or any reproduction, counterfeit copy or colorable imitation thereof that is not a genuine Plaintiffs' Product or not authorized by Plaintiffs to be sold in connection with Plaintiffs' Trademarks; and

2) That Defendants, within fourteen (14) days after service of judgment with notice of entry thereof upon them, be required to file with the Court and serve upon Plaintiffs a written report under oath setting forth in detail the manner and form in which Defendants have complied with paragraph 1, a through h, above;

3) Entry of an Order that, at Plaintiffs' choosing, the registrant of the Defendant Domain Names shall be changed from the current registrant to Plaintiffs, and that the domain name registries for the Defendant Domain Names, including, but not limited to, VeriSign, Inc., Neustar, Inc., Afilias Limited, CentralNic, Nominet, and the Public Interest Registry, shall unlock and change the registrar of record for the Defendant Domain Names to a registrar of Plaintiffs' selection, and that the domain name registrars take any steps necessary to transfer the Defendant Domain Names to a registrar of Plaintiffs' selection; or that the same domain

name registries shall disable the Defendant Domain Names and make them inactive and untransferable;

4) Entry of an Order that, upon Plaintiffs' request, those in privity with Defendants and those with notice of the injunction, including any online marketplaces such as iOffer and Alibaba Group Holding Ltd., Alipay.com Co., Ltd. and any related Alibaba entities (collectively, "Alibaba"), social media platforms, Facebook, YouTube, LinkedIn, Twitter, Internet search engines such as Google, Bing and Yahoo, web hosts for the Defendant Domain Names, and domain name registrars, shall:

    a. disable and cease providing services for any accounts through which Defendants engage in the sale of Counterfeit Products using Plaintiffs' Trademarks, including any accounts associated with the Defendants listed on Schedule A;

    b. disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of Counterfeit Products using Plaintiffs' Trademarks; and

    c. take all steps necessary to prevent links to the Defendant Domain Names identified on Schedule A from displaying in search results, including, but not limited to, removing links to the Defendant Domain Names from any search index; and

5) That Defendants account for and pay to Plaintiffs all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiffs' Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

6) In the alternative, that Plaintiffs be awarded statutory damages pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiffs' Trademarks and $100,000 per domain name incorporating any of Plaintiffs' Trademarks pursuant to 15 U.S.C. § 1117(d);

7) That Plaintiffs be awarded their reasonable attorneys' fees and costs; and

8) Award any and all other relief that this Court deems just and proper.

Dated this 8th day of July 2015.        Respectfully submitted,

/s/ Justin R. Gaudio
Kevin W. Guynn
Amy C. Ziegler
Justin R. Gaudio
Jessica L. Bloodgood
Greer, Burns & Crain, Ltd.
300 South Wacker Drive, Suite 2500
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
kguynn@gbclaw.net
aziegler@gbclaw.net
jgaudio@gbclaw.net
jbloodgood@gbclaw.net

*Counsel for Plaintiffs Richemont International SA, Cartier International A.G., Montblanc-Simplo GmbH, Chloe S.A.S., Van Cleef & Arpels SA, Officine Panerai A.G., and Lancel International SA*